IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANNETTE FIGUEROA,<br><br>    *Plaintiff,*<br><br>  v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>    *Defendant.* | CIVIL ACTION<br>NO. 17-2336 |

**PAPPERT, J.**                                                                                               January 24, 2019

**<u>MEMORANDUM</u>**

Annette Figueroa seeks judicial review of the Commissioner of Social Security's denial of her application for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act. The Court referred the case to Magistrate Judge Lynne A. Sitarski for a Report and Recommendation. (ECF No. 18.) Upon careful consideration of Figueroa's Brief and Statement of Issues in Support of Request for Review (ECF No. 10), the Commissioner's Response (ECF No. 15), Figueroa's Reply (ECF No. 17), Judge Sitarski's R. & R. (ECF No. 19), Figueroa's Objections (ECF No. 20), the Commissioner's Response (ECF No. 22) and the Administrative Record[1] (ECF No. 9), the Court overrules Figueroa's objections and adopts the R. & R. denying her request for review and affirming the Commissioner's decision.

---

[1]     The record, consisting of 567 numbered pages, was uploaded to ECF. *See* (ECF Nos. 9-1–9-11). The Court will cite to the record page numbers rather than ECF document numbers.

I

Figueroa applied for DIB and SSI on June 25 and July 21, 2014, respectively, alleging disability beginning June 1, 2009. (Administrative Record ("R.") 23, 141.) She was forty-six years old at the time of her application. (*Id.* at 34, 81.) Her ex-husband is deceased; she now lives with her fiancé and her daughter. (*Id.* at 61, 468.) Figueroa did not complete the twelfth grade. (*Id.* at 46.) She has worked as a sales representative, packaging supervisor and floor manager of a children's clothing department, and she stopped working in 2009. (*Id.* at 47–49, 86–87, 194.) She drives roughly two to three times per week, usually to the grocery store or the laundromat with her daughter. (*Id.* at 45, 63–64.)

Figueroa seeks DIB and SSI due to a number of impairments, including residuals of hernia surgery, mild degenerative disc disease of the lumbar spine, moderate degenerative disease of the left knee, vertigo, recurrent headaches, anxiety and bipolar disorder. (*Id.* at 26.) Figueroa objects to Judge Sitarski's R. & R. as it pertains to the intensity, persistence or functionally limiting effects of her vertigo, recurrent headaches, anxiety and bipolar disorder, so the Court will address facts relevant to only those impairments.

In October of 2010, Figueroa was admitted to the Observation Unit of Albert Einstein Hospital for peripheral vertigo after she complained that her "balance [was] off" and she was experiencing dizziness and frontal head pressure. (*Id.* at 225–29.) The hospital performed a CT scan and the results were unremarkable. (*Id.* at 248.) Figueroa left in stable condition. (*Id.* at 239.)

She experienced dizziness again in August of 2011. (*Id.* at 427, 433.) This time, she consulted Frank Marlowe, M.D., who found that she had mild positional vertigo. (*Id.*) The results of Dr. Marlowe's neurologic examination of Figueroa were normal. (*Id.*) He advised her to perform vestibular rehabilitation exercises at home and wrote her a prescription for Diazepam, a sedative. (*Id.* at 434.) In November of 2011, Figueroa told Marlowe that her condition had not improved; in December, she reported "non stable" improvement—"1 day good, next day bad." (*Id.* at 425, 434.)

Figueroa returned to Albert Einstein Hospital in January of 2012 for an MRI. (*Id.* at 432.) The MRI revealed "[n]o acute cranial abnormality" and "a single . . . prolongation in the left occipital lobe, of doubtful clinical significance." (*Id.*) Dr. Marlowe reviewed the MRI results. (*Id.* at 425.) In August of 2012, Figueroa told Marlowe that nothing was alleviating her vertigo, which she still experienced "all the time." (*Id.* at 424.) She did not visit Marlowe again until June of 2014, at which time he prescribed Lipo-Flavonoid, an ear health supplement. (*Id.* at 423.) She continued to make follow-up visits until December of that year.[2] (*Id.* at 414, 423.)

Around that time, Figueroa was referred by the Bureau of Disability Determination to Kathleen Mullin, M.D., an internist who examined her in September of 2014. (*Id.* at 341.) Dr. Mullin noted that Figueroa complained of vertigo and frequent headaches occurring roughly every other day, triggered by bending and moving quickly. (*Id.*) Mullin found her mental status normal, with no evidence of impaired judgment or significant memory impairment. (*Id.* at 344.) Mullin completed

---

[2] Figueroa returned to Dr. Marlowe once more in June of 2015. (*Id.* at 414.) Marlowe conducted a neurologic examination and found the results unremarkable. (*Id.*) In his report of the visit, he noted that Figueroa suffered from "vertiginous migraine and mild high frequency only sensorineural hearing loss." (Id.)

3

a medical source statement for Figueroa on September 19, 2014, reporting that Figueroa could sit for four hours and walk and stand for thirty minutes without interruption, and could sit for five hours, stand for two hours and walk for one hour over the course of an eight-hour work day. (*Id.* at 347–78.) Mullin noted that Figueroa should never climb ladders or scaffolds, move mechanical parts or operate a motor vehicle, but she could occasionally balance, climb stairs, stoop, kneel, crouch and crawl. (*Id.* at 350–51.) Mullin concluded that Figueroa could perform activities like shopping, caring for herself, traveling and handling paper or files.[3] (*Id.* at 352.)

Figueroa began seeing therapist Juan Carlos Ortiz, a mental health professional, in October of 2014. (*Id.* at 392–408.) During the first session, Ortiz diagnosed Figueroa with bipolar depression and anxiety and anticipated that treating her would take three to six months. (*Id.* at 392.) Figueroa continued attending therapy twice per month. (*Id.* at 356–370.) Ortiz conducted a mental status examination of her during each session; each time, he found her fully oriented and alert with memory intact and no disturbances in her thought processes.[4] (*Id.* at 363, 365, 368–69.)

On January 29, 2015, Ortiz prepared a Mental Assessment Form for Figueroa in which he stated she had "poor to [no]" ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention/concentration or behave in an emotionally stable manner. (*Id.* at 356–57.)

---

[3]     Before Figueroa filed her first application for DIB in 2011, she obtained a medical source statement from Oung Thain, M.D., the internist who treated her after her hernia surgery in 2009. (R. 314–16.) Dr. Thain reported that Figueroa could stand and walk up to five or six hours per day and could balance, bend, kneel, stoop, crouch, climb and operate machinery without limitation. (*Id.* at 315–16.)

[4]     Ortiz did not evaluate Figueroa's thought processes or memory during the examination he conducted in early November. (R. 369.)

4

He marked that she had "fair" ability to use judgment with the public and function independently, and "good" ability to understand, remember and carry out simple job instructions. (*Id.*) He wrote that Figueroa "suffers from panic attacks that are triggered by people," "has repeated mood swings where she snaps at others," "has difficulty sleeping . . . which affects her cognitive functioning," and has "reported having mood swings that have been triggered by 'little' things." (*Id.* at 357–58.) Her "clinical history," he observed, shows "that she has trust issues and loss of memory" and has difficulty concentrating and focusing. (*Id.*)

On a supplemental RFC questionnaire, Ortiz noted that Figueroa has several "moderately severe" limitations: limited ability to relate to other people and perform work where contact with others is minimal, restriction of daily activities, deterioration of personal habits and constriction of interests. (*Id.* at 359.) He also noted "severe" limitations, including her limited ability to comprehend and follow instructions, perform work requiring frequent contact with others and perform complex, competitive or varied tasks. (*Id.* at 358–60.) Ortiz stated that Figueroa's impairments had lasted or could be expected to last twelve months or longer. (*Id.* at 360.)

While seeing Ortiz for therapy, Figueroa also began seeing psychiatrist Roger Erro, M.D. (*Id.* at 496.) All mental status examinations conducted by Dr. Erro show that she was fully oriented and alert with "fair to good" insight and judgment.[5] (*Id.* at 515–16, 519–20.) In January of 2016, Erro reported that she was stable, her symptoms

---

[5] In early December of 2015 and late January of 2016, Dr. Erro used a different mental status examination checklist than the checklist he used during other visits. (R. 503–04, 510–11.) The checklists did not ask Erro to rate Figueroa's insight or judgment. (*Id.*) Instead, they asked Erro to rate her immediate, recent and remote cognitive memory; each time, Erro noted that her memory was intact. (*Id.*)

5

had been effectively managed, she was "doing well with current treatment regimen," and he saw no signs of regression. (*Id.* at 501–02.)

Figueroa's application for DIB and SSI was initially denied by the Social Security Administration on September 25, 2014. (*Id.* at 90.) On October 14, 2014, she filed a request for a hearing before an Administrative Law Judge, which was held on February 23, 2016. (*Id.* at 40, 95.) Figueroa, represented by counsel, and an impartial vocational expert testified at the hearing. (*Id.*) On April 27, 2016, after reviewing the record and applying the five-step sequential evaluation process,[6] the ALJ held that Figueroa is not disabled under the Social Security Act and denied her claim. (*Id*. at 35.)

At step one, the ALJ determined that Figueroa had not engaged in substantial gainful activity since June 1, 2009, the date of the alleged onset of her disability. (*Id.* at 25.) At step two, the ALJ found that she has several severe physical and mental impairments. (*Id.* at 26.) At step three, he determined that the impairments, either alone or in combination, do not meet the severity of one of the impairments listed in 20

---

[6] The Commissioner has established a five-step process to determine whether claimants are disabled. 20 C.F.R. § 416.920(a). At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity." *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004) (citation omitted); 20 C.F.R. § 416.920(b). If not, the ALJ proceeds to step two where he or she must determine whether the claimant has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." *Ramirez*, 372 F.3d at 550 (citation omitted); 20 C.F.R. § 416.920(c). If the claimant successfully demonstrates a "severe impairment," the ALJ proceeds to step three to assess whether the impairment meets or medically equals one of the listed impairments; if so, the claimant qualifies for disability. *Ramirez*, 372 F.3d at 550–51 (citation omitted); 20 C.F.R. §416.920(d). If, however, the impairment does not meet or medically equal a listed impairment, the inquiry proceeds to step four where the ALJ determines whether the claimant has the "residual functional capacity" (RFC) to perform any prior relevant work. *Ramirez*, 372 F.3d at 551; 20 C.F.R. §416.920(e). If the claimant can perform any prior relevant work, he or she will not be found disabled. *Ramirez*, 372 F.3d at 551. If not, the fifth step requires the ALJ to consider "vocational factors" (age, education and past work experience) to determine whether the claimant is capable of performing other jobs existing in the national economy. *Id.* (citing 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c)).

C.F.R. pt. 404, subpt. P, app. 1.[7] (*Id.* at 26–27.) At step four, he stated that Figueroa had the RFC to:

> [P]erform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) except [she] is limited to simple, routine tasks requiring no more than reasoning level 2, [she] is limited to no working on assembly lines or in teams with little change in the work setting or work processes; and [she] is limited to no work around moving machinery, unprotected heights, driving automotive equipment, or climbing ladders and scaffolds.

(*Id.* at 29.) Given the RFC assessment, the ALJ concluded that Figueroa could not perform her past relevant work. (*Id.* at 34.) Considering Figueroa's age, education, work experience, RFC and the vocational expert's testimony, the ALJ determined that jobs exist in significant numbers in the U.S. economy that Figueroa can still perform, including table worker, gauger and pharmaceutical packer. (*Id.* at 35.)

Figueroa filed a request for review with the Appeals Council on April 29, 2016. (*Id.* at 17.) The Council denied the request on April 20, 2017, rendering the ALJ's decision final. (*Id.* at 1–4.) Figueroa filed this action on May 24, 2017, seeking judicial review of the ALJ's decision. (Compl., ECF No. 3.) She argued that the ALJ erred by (1) giving little weight to the medical opinion of Mr. Ortiz and (2) failing to account for all of her limitations when determining her RFC. (Pl.'s Br. 2, 11.) On September 20, 2018, Judge Sitarski recommended that Figueroa's request for review be denied. (R. &. R. 1.) Figueroa raises one objection to the R. & R. which the Court overrules for the reasons that follow.

---

[7] With respect to Figueroa's alleged mental impairments, the ALJ found that her activities of daily living and social functioning are mildly restricted, she has moderate difficulty with concentration, persistence or pace and the record reflects no episodes of decompensation. (R. 28.)

7

II

Upon designation, a magistrate judge may conduct hearings and submit proposed findings of fact and recommendations to a judge of the court for disposition. 28 U.S.C. § 636(b)(1)(B); *Dries v. Berryhill*, 2017 WL 4922011 at *2 (M.D. Pa. Oct. 31, 2017). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When no objections are made to the R. & R., "the court should, as a matter of good practice, 'satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Latorre v. Wetzel*, 2016 WL 3014874 at *1 (E.D. Pa. May 26, 2016) (quoting Fed. R. Civ. P. 72(b) advisory committee's note); *see also Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987) (explaining that judges should give some review to every R. & R.). For the portions of the R. &. R to which neither party objected, no clear error appears on the face of the record and the Court accordingly accepts Judge Sitarski's report.

The Court reviews *de novo* those portions of the R. & R. to which Figueroa objects. *See* 28 U.S.C. § 636(b)(1); *see also Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). The Court's role on review is to determine whether the ALJ's determinations were supported by substantial evidence. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence is evidence that a "reasonable mind might accept as adequate to support a conclusion." *Rutherford*, 399 F.3d at 552 (internal quotations omitted). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id*. (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)).

In reviewing the ALJ's decision, the Court is not permitted to weigh the evidence or substitute its own conclusions for those reached by the ALJ. *See Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). "The ALJ resolves conflicts in the evidence, determines the evidence's credibility, and assigns the appropriate weight to be given such evidence." *D'angelo v. Colvin*, 2016 WL 930690 at *2 (E.D. Pa. Mar. 11, 2016) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) and *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 2004)). If the ALJ's decision is supported by substantial evidence, the Court may not set it aside "even if [the Court] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). The ALJ's decision need only discuss the most relevant evidence concerning a claimant's disability, "but it must provide sufficient discussion to allow the reviewing Court to determine whether its rejection of potentially significant evidence was proper." *D'angelo*, 2016 WL 930690 at *1 (citing *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir. 2008)).

III

Figueroa objects to Judge Sitarski's conclusion that the ALJ did not err in giving little weight to the medical opinion of her therapist, Juan Carlos Ortiz, at step four of the evaluation.

Therapists are "not acceptable medical sources" for the purposes of determining a claimant's RFC, and their opinions are not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1502, 404.1527; *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999). Nonetheless, the ALJ must review all medical opinions in the record, including those that are not considered "acceptable." *Arce v. Astrue*, 2009 WL 4582181 at *5 (E.D. Pa.

9

Dec. 3, 2009); *see also* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion.").

The ALJ's decision to give "partial weight"[8] to Ortiz's opinion is supported by substantial evidence, as is his determination of Figueroa's RFC. The ALJ considered Ortiz's opinion along with acceptable medical source opinions from Dr. Thain, Dr. Mullin, Dr. Erro, her treating psychiatrist, and Louis Tedesco, M.D, a state agency physician.[9] (R. at 32–33.) He reviewed records of each of Ortiz's therapy sessions with Figueroa from late 2014 to early 2016 and compared Ortiz's statements in the Mental Assessment Form to those records, Figueroa's testimony and other medical evidence in the record. (*Id.* at 31–33.)

In assigning little weight to Ortiz's opinion that Figueroa cannot handle slight changes, the ALJ explained that the record reflects more serious triggers of her panic attacks than slight changes. (*Id.* at 33.) He cited Dr. Erro's treatment notes from November of 2015, soon after Figueroa's ex-husband passed away, in which Erro reported that she was "stable although she has been grieving." (*Id.* at 33, 468–69.) The ALJ also cited Ortiz's own notes from a therapy session in February of 2016, where Ortiz stated that Figueroa has "learned to 'transport [herself] out from the same' problem behaviors" and her assessment was "stable, free of side effects and taking her

---

[8] The ALJ gave little weight to some of Ortiz's statements on the Mental Assessment Form, discussed below, but he gave "great weight" to Ortiz's opinion that Figueroa is able to perform simple tasks because this finding is supported by Ortiz's own treatment notes. (R. 32–33.)

[9] The ALJ assigned little weight to the opinions of Dr. Thain and Dr. Tedasco. (R. 32.) He determined that Figueroa's impairments were more severe than Thain and Tedasco's opinions suggested and concluded that a more restrictive RFC was warranted. (*Id.*)

10

current medications as prescribed." (*Id.* at 498–99.) Moreover, even though he found no support for Ortiz's opinion, the ALJ still accounted for Figueroa's susceptibility to panic attacks in the RFC by limiting her to jobs with "little change in the work setting or work process." (*Id.* at 29.)

In assigning little weight to Ortiz's opinion that Figueroa has "moderately severe" limitations in her ability to relate to others and perform work where contact with others is minimal and "moderately severe" restriction of daily activities and deterioration of personal habits, the ALJ explained that this opinion conflicts with Dr. Erro's observation that Figueroa was stable and showed no signs of regression in January of 2016. (*Id.* at 33.) The ALJ also considered Figueroa's testimony that she can care for herself, drive, clean and engage in activities like crossword puzzles. (*Id.* at 30.) And again, even though he did not find full support for Ortiz's opinion in the record, the ALJ still accounted for Figueroa's impairments in the RFC by limiting her to jobs without assembly lines or work in teams. (*Id.* at 29.) During the hearing, he also ensured that none of the jobs proposed by the vocational expert require more than occasional interaction with the public, co-workers or supervisors. (*Id.* at 75–76.)

An appropriate Order follows.

                                              BY THE COURT:

                                              ***/s/ Gerald J. Pappert***
                                              GERALD J. PAPPERT, J.